31 C.C.P.A.(Patents)

**VITAB CORPORATION v. KNOX CO. et al.**

Patent Appeal No. 4891.

Court of Customs and Patent Appeals.
June 19, 1944.

Harold A. Swanson, of Harrison, N. J., for appellant.

A. Viault of New York City, for appellee Knox Co.

Asher Blum, of New York City (Hugo Mock and David L. Klein, both of New York City, Charles R. Allen, of Washington, D. C., and Alex Friedman, of New York City, of counsel), for appellee Endo Products, Inc.

Before BLAND, Acting Presiding Judge, and HATFIELD, LENROOT, and JACKSON, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal in a trade-mark interference proceeding from the decision of the Commissioner of Patents holding that there was no interference in fact between the applications of appellant (the Vitab Corporation) and those of the appellees, and dissolving the interference for reasons hereinafter set forth.

Appellant's application, No. 422,882, filed August 23, 1939, is for the registration of the term "Vetab" for use on "liquid and powdered extracts of rice bran, rice polishings, wheat germ and milk whey containing the vitamin B complex, dry powders comprising an adsorbate of the liquid extracts on Fullers earth or similar clays in Class 6 chemicals, medicines, and pharmaceutical preparations."

It is stated in that application that appellant is the owner by assignment of registration No. 303,022, issued May 9, 1933, and registration No. 316,015, issued August 14, 1934.

On July 6, 1939, appellant filed an application, No. 421,330, for the registration of the term "Vitab" for use, as stated in an amendment dated August 29, 1939, on "liquid and powdered extracts of rice bran, rice polishings, wheat germ and milk whey containing a vitamin B complex, dry powders comprising an adsorbate of the liquid extracts on Fullers earth or similar clays in class 6, chemicals, medicines and pharmaceutical preparations," and called attention therein to its ownership of the registrations referred to in its application No. 422,882.

Appellant's registration No. 303,022 is for the trade-mark "Vitab" for use on "bread, brown rice, crisp bread, soya bean flour and rice polishings, in Class 46, Foods and ingredients of foods." Its registration No. 316,015 is for the trade-mark "Vitab" for use on a "cereal concentrate, that is, a flour-like preparation of wheat germ and rice polishings, in Class 46, Foods and ingredients of foods."

Appellee Knox Company's application here involved, No. 423,541, was filed September 1, 1939, and is for the registration of a trade-mark, the dominant feature of which is the term "Vi-Tabs," for use on "Medicine for Invigorating, Stimulating, Maintaining and Restoring the Vitality of the Genital System of the Human Body, and for the Treatment of Sexual Weakness, Nervousness, Loss of Virility and Impotence, and to Build Blood, Strengthen the Bones, and Restore Lost Energy, in Class 6, Chemicals, Medicines and Pharmaceutical Preparations."

The application of Endo Products, Inc., No. 407,585, was filed June 17, 1938, and is for the registration of the term "Vitabee" for use as a trade-mark on "a preparation used to supply vitamin $B_1$ through injections, in Class 6, Chemicals, Medicines, and Pharmaceutical preparations."

In holding that there was no interference in fact between appellant's applications and those of the appellees, the commissioner stated, in substance, that appellant's products were foods, whereas the product of each of the appellees was a medicinal preparation, and that, therefore, appellant's products were not goods of the same descriptive properties as those of the appellees. The commissioner further stated that the goods of the Knox Company and those of Endo Products, Inc., were goods of the same descriptive properties, but that they differed widely in many of their essential characteristics and were not competitive; that the marks of those parties, although similar, were by no means identical; and that "The Knox Company and Endo Products, Inc., appear to be in agreement that the concurrent use of their marks is not likely to result in confusion; and each is willing that the other's mark be registered. Upon the record before me, I am constrained to accept the judgment of the parties in that regard."

The commissioner then reversed the decision of the Examiner of Interferences and dissolved the interference.

The first issue to be decided is whether, in view of the fact that the commissioner dissolved the interference, this court has jurisdiction of the appeal. That issue was raised at the time of the oral arguments by a member of the court, and briefs were submitted by counsel for the parties relative thereto.

An interlocutory order dissolving a trade-mark interference proceeding in the Patent Office is not appealable to this court. See Union Distilling Company v. Schneider, 29 App.D.C. 1, wherein it was held that the dissolution of a trade-mark interference in the Patent Office because of

the existence of a prior registration was not a final decision from which an appeal would lie to the court.

Counsel for appellant in that case argued that the prior registration referred to was not valid and was not prima facie evidence of ownership because the act of 1870, 16 Stat. 198, under which it issued had been held to be unconstitutional.

In its opinion, the court called attention to the fact that in the case of Ex parte Star Distillery Co., 119 O.G. 964, it was held that registrations under the act of 1870 were to be regarded as proper references until overcome in some way by an applicant, and stated that "appellant's remedy would seem to be not an interference, but a showing in the form of affidavits tending to overcome the presumption that the registrant under the act of 1870 is still the owner of the mark. If such affidavits are filed, a continuance of the present interference will necessarily follow." The court then held that as the appeal before it was not from a final order refusing registration, but from an interlocutory order, the appeal did not lie.

In the case of In re Herbst, 32 App.D. C. 269, it appears that there had been an interference in the Patent Office involving the party Herbst and other parties who were attempting to register the words "Old Judge" for use as a trade-mark. During the taking of testimony, it was found that the mark had been adopted and used by a stranger to the interference proceeding long prior to its adoption and use by any of the parties to the interference. When that fact was called to the attention of the Examiner of Interferences, he held that none of the parties to the interference was entitled to the registration of the mark. On appeal, the Commissioner of Patents affirmed the decision of the Examiner of Interferences. After the commissioner's decision had become final, the party Herbst made application to the Examiner of Trade-Marks, requesting that his original application be allowed. The examiner denied the application on the ground that the decision of the commissioner in the interference proceeding had become final. On appeal, the commissioner affirmed the decision of the examiner. The court held that as the appellant did not file an appeal from the commissioner's decision, the decision became final and the issue was res adjudicata. The court also called attention

to section 7 of the Trade-Mark Act of February 20, 1905, 15 U.S.C.A. § 87, which provides, in part, that the commissioner may declare that an interference exists between applications for trade-mark registrations, "and in every case of interference or opposition to registration he shall direct the examiner in charge of interferences to determine the question of the right of registration to such trade-mark, and of the sufficiency of objections to registration, in such manner and upon such notice to those interested as the commissioner may by rules prescribe." The section further provides that the commissioner may refuse to register both of two interfering marks.

A petition for rehearing was filed in the Herbst case, supra, and was denied in a written opinion (32 App.D.C. 565), wherein the court called attention to the fact that under section 7, supra, the commissioner had the power to refuse to register " 'both of two interfering marks,' or to 'register the mark, as a trademark, for the person first to adopt and use the mark, if otherwise entitled to register the same,' " and stated that in a trade-mark interference proceeding the issue is not merely one of priority, as in a patent interference proceeding, but involves any issue that might be raised in an ex parte case. The court also stated that the provision in section 9 of the Trade-Mark Act of February 20, 1905, 15 U.S.C.A. § 89, that "the same rules of practice and procedure shall govern in trademark cases as in patent cases 'as far as the same may be applicable,' " was not in conflict with the statement of the court that in a trade-mark interference proceeding the issue is not merely one of priority.

■ In the instant case, the commissioner in dissolving the interference not only held that the goods of appellant were essentially foods and that those of the appellees were medicinal preparations, but also held that the trade-marks of each of the appellees could be registered for use on their respective goods. Obviously, the holding of the commissioner prevents appellant from securing registration of its marks for use on its goods as medicinal preparations, and, under the commissioner's decision, appellant would be estopped, unless an appeal would lie therefrom, from prosecuting its present applications for the registration of its trade-marks.

We are of opinion that the decision of the commissioner was a final decision, and

that this court has jurisdiction of appellant's appeal. Accordingly, we will proceed to consider the case on its merits.

The witness Aaron Arnold, testifying for appellant, stated that he was associate head of the Vitamin Chemical Laboratory of the National Oil Products Company (the owner of the appellant company); that he received his Bachelor's Degree in Science from the University of Wisconsin in 1933, and the Degree of Doctor of Philosophy in July 1937 from the same University; that he majored in organic chemistry; that in his graduate work he majored in biochemistry; that from 1937 to 1939 he had post graduate work at the University; that during that period and to the time of the taking of his testimony he specialized in animal nutrition, "with particular reference to vitamins"; and that at the time his testimony was taken he was engaged primarily in research. The witness further testified that vitamins might be classified in two groups, the fat soluble group and the water soluble group; that vitamins A, D, E, and K are in the fat soluble group and vitamin B complex and vitamin C are in the water soluble group; that the vitamin B. complex contains thiamin, nicotinic acid, riboflavin, pyridoxin, pantothenic acid, and biotin; and that literature on the subject indicated that several of the vitamins, if given in excessive amounts, are seriously toxic. As authority for the latter statement, the witness referred to a publication prepared by Dr. Robert R. Williams and Tom D. Spies, entitled "Vitamin B1 and Its Use in Medicine." The witness also stated that vitamin B1 extracted from "natural sources" and synthetic vitamin B1 have the same physiological effect; that they are the same chemically; that they have the same structural formula; that vitamin B1 is not a food; that, although vitamins are termed accessory food factors, the recognized vitamins "yield no caloric energy, to permit sustenance of life"; that an individual suffering from want of proper vitamins should secure a competent diagnosis (which would, of course, be by a physician) in order to ascertain what vitamins should be administered; that the vitamins administered might be either natural or synthetic; and that night blindness, pellegra, and beriberi are symptomatic manifestations of certain vitamin deficiencies.

Appellant's witness Eric John Simons stated that he was employed by the National Oil Products Company as head of the biochemical department; that his duties were limited to research in fat soluble vitamins, particularly vitamin D. The witness was then asked without objection by counsel for either of the appellees whether he had listened to the testimony of appellant's witness Dr. Arnold and, if so, whether he agreed with that testimony. He replied that he had listened to Dr. Arnold's testimony, and that he was in agreement with it in all respects. On cross-examination he was asked whether his Degrees were in medicine or chemistry, and he said that they were in chemistry.

Appellant's witness Harry Herschel Weinstock, Jr., testified that he received the Degree of Bachelor of Chemistry from Cornell University in 1933; that he received his Master's Degree in 1934 from the University of Oregon; that he received his Degree of Doctor of Philosophy from the latter University in 1937, although he completed his work therefor in 1936; that from 1936 to 1939 he was employed by the Oregon State College and was doing research on the chemistry of pantothenic acid; that from 1939 to the time of the taking of his testimony he had been employed by the National Oil Products Company; that pantothenic acid is a vitamin; and that at Oregon State College he worked with Dr. Robert R. Williams, who, together with the witness and other coworkers, "published the synthesis and structural formula of pantothenic acid." He was also permitted to testify without objection that he had been present during the taking of Dr. Arnold's testimony, and that he was in agreement with that testimony. The witness stated that he had in his possession certain literature dealing with the physiological activity of synthetic vitamin B1 and vitamin B1 obtained from natural sources. The literature to which the witness referred, introduced in evidence as appellant's Exhibit No. 61, was a paper entitled "Studies of Crystalline Vitamin B1 XVII synthesis of Vitamin B1," prepared by Joseph K. Cline, Robert R. Williams, and Jacob Finkelstein and published in the Journal of the American Chemical Society, Vol. 59, page 1052, 1937. The witness quoted therefrom as follows: "Furthermore, numerous physiological tests including both curative and prophylactic experiments have likewise indicated as yet no significant deviations among the two forms of synthetic and the natural chloride." The witness further testified

that the accepted chemical terms for vitamin B1 are aneurin and thiamin, and that thiamin is the most accepted term; that vitamin B1 is also called thiamin chloride; and that the chloride referred to in the quoted excerpt from appellant's Exhibit No., 61 was thiamin chloride. On cross-examination, the witness testified that he was not a doctor of medicine, and that he had never made any actual tests of appellant's product and, therefore, could not state whether it contained vitamins.

It is clearly established by the evidence that appellant's products are rich in vitamin B1 and other vitamins.

Dr. Roland A. Bosee, testifying for Endo Products, Inc., stated that he was in the employ of that company as director of laboratories; that his company purchased some of appellant's products; that they were used "experimentally to produce a vitamin complex preparation" to be administered "intravenously or intramuscularly or subcutaneously"; that the product was satisfactory after specific alterations by his concern. The alterations, the witness stated, were as follows: Appellant's product was taken up in a quantity of distilled water to which was added a sufficient quantity of synthetic vitamin factors to bring it up to a concentration which his company desired, the solution was permitted to stand in the "cold" for a predetermined period of time, it was then subjected to a centrifuging process to remove any substances that might have been precipitated while it was standing in the "cold" and was finally made up into the required volume with triple distilled water, filtered, and poured into ampoules or vials, it was then subjected to a sterilizing process and tested for sterility. The product thus made was labeled and packaged and sold under the trade-mark "Manibee" directly to physicians, medical institutions, and pharmacies. The witness stated that he did not consider himself an expert in the vitamin field, but that he considered the product of Endo Products, Inc., involved in its application, a medicinal preparation. He also testified that there was *no distinction in chemical structure between the natural vitamin B1 and that produced synthetically.*

It may be said at this point that the product of Endo Products, Inc., on which it uses the trade-mark "Vitabee," is a synthetic preparation, and was not produced from appellant's product.

Albert Viault, who acted a portion of the time as attorney for both of the appellees, testified at length on their behalf. He stated that as a layman it was his opinion that *"all vitamins are foods"* as distinguished from drugs, although, as we understand his testimony, he was of opinion that an ethical vitamin product which is sold only to physicians, medical institutions, and pharmacies to be administered hypodermically by physicians is a medicine. (Italics ours.) However, it is clear from the record that there is not much, if, any, difference in the nutritional value of appellant's liquid product, so far as vitamin B1 is concerned, and that of Endo Products, Inc.

The witness Dr. R. A. Goodall, testifying for the Knox Company, stated that he was a doctor of medicine and a doctor of chemistry; that he was medical director for the Knox Company; that his duties were to conduct assays on drugs purchased by his company to determine their potency and purity according to the United States Pharmacopoeia, and also to conduct assays on merchandise manufactured *for* his company, before it was released to drug stores for retail sales; and that outside of his routine work he also conducted researches in vitamins, or, as he put it, "vitamin containing substances." He further stated that the function of the vitamin B complex is the same as the function of any other vitamin, that is, to prevent symptoms of nutritional deficiency; that vitamins are used to cure nutritional diseases; that he knew of no other use for vitamins alone or in combination; that the natural sources of vitamin B complex are bran, rice polishings, and cereals in general; that vitamin B complex is also produced synthetically; that he would not classify an adsorbate of the vitamin B complex in Fullers earth as a *drug per se*; and that, although some people might disagree with him, he *considered both the synthetic vitamin and the extract of the natural vitamin as accessory food factors,* and that his views were reflected by those who "are engaged as deeply in research of medicine as I am." When asked whether it had ever come to his attention professionally or otherwise that the vitamin B complex was scientifically and accurately described as a drug per se, he said: "No, no. Vitamins, in my opinion, natural, concentrated or synthetic, could never be tabulated as drugs, for this reason:

*In no form do they apply stimulation or sedation to any part of the human anatomy, which of course is the office of drugs.* Drugs, pure drugs, or impure drugs for that matter, supply stimulation or sedation to a part." (Italics ours.)

There is considerable other evidence, tending to establish that vitamins, whether administered hypodermically or orally, are medicinal in character. There is also other evidence to the effect that they are foods or accessory food factors. However, we deem it unnecessary to detail all of that evidence here.

According to the evidence submitted by the Knox Company, its product, which it sells under the trade-mark "Vi-Tabs," is medicinal in character and does not contain any of the vitamins.

It is clear from the evidence that vitamins are used for the prevention of bodily disorders and to cure certain ailments, such as night blindness, pellegra, and beriberi, and that vitamin B1 "is generally referred to as the antineuritic vitamin."

Medicine is defined in Webster's New International Dictionary as "The science and art dealing with the prevention, cure, or alleviation of disease; in a narrower sense, that part of the science and art of restoring and preserving health which is the province of the physician as distinguished from the surgeon and obstetrician."

Medicinal is defined by the same authority as a "Curative or alleviative; used for the cure or alleviation of bodily disorders."

Medicinal preparations may be put in various forms, such as liquids, tablets, capsules, or powders, and a medicinal preparation is none the less a medicinal preparation because it is sold over the counter to the public generally rather than to druggists, physicians, and medical institutions to be administered hypodermically by physicians.

By these observations, we do not attempt to technically define the terms "medicinal" and "medicine." We are here concerned only with the question: Would the purchasing public, in view of appellant's use of the trade-marks "Vetab" and "Vitab" and the use by the Knox Company of the mark "Vi-Tabs" and the use by Endo Products, Inc., of the mark "Vitabee" on the respective goods of the parties, be likely to be confused or deceived into believing that the goods of the parties emanate from the same source?

We are of opinion that the use by the respective parties of their trade-marks would be likely to cause confusion in the trade and deceive purchasers, and that the goods of the parties possess the same descriptive properties.

In so holding, we have considered all of the arguments presented here by counsel for appellant as well as those presented by counsel for Endo Products, Inc. No brief was filed in this court on behalf of the Knox Company, one of the appellees.

We do not here determine the question of priority of use. The commissioner did not pass upon that question, and, owing to the views he held, it was unnecessary for him to do so.

However, in view of our holding that there is an interference in fact between the applications of the parties here involved and as this is an interference proceeding, we think the commissioner should pass upon the question of priority of use and such other questions as might properly be before him.

Counsel for appellant contend in their brief that the commissioner erred in not considering the statements contained in the notice of opposition of each of the appellees that the goods of the parties to the interference possess the same descriptive properties, and that the marks are confusingly similar. However, that issue was not raised in appellant's reasons of appeal, and, therefore, we do not consider it.

For the reasons stated, the decision of the commissioner is reversed and the cause remanded for proceedings consistent with the views herein expressed.

Reversed and remanded.

GARRETT, Presiding Judge, did not participate in the consideration or decision of this case.

LENROOT, Judge, sat during the arguments of this case, but resigned before the opinion was prepared.